## UNITED STATES DISTRICT COURT
### EASTERN DISTRICT OF KENTUCKY
### CENTRAL DIVISION
### LEXINGTON

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | NO. 5:22-CR-0054-DCR-MAS |
| v. | ) | |
| | ) | |
| COYT JAMES HELTON, | ) | |
| | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## REPORT AND RECOMMENDATION

This case is before the Court on Defendant Coty James Helton's ("Helton") Motion to Suppress. [DE 19]. Helton moves to suppress evidence seized during a warrantless search of the vehicle he was driving on November 25, 2021, arguing that the evidence was fruit of an unlawful search and seizure. [DE 19-1 (Memorandum in Support of Motion to Suppress), Page ID# 66-68]. The United States responded [DE 21], and the Court held an evidentiary hearing [DE 22 (Suppression Hearing Minutes); DE 23 (Exhibit and Witness List)]. For the reasons stated herein, the undersigned recommends the District Court deny Helton's motion.

## I.    FACTUAL BACKGROUND[1]

On November 24, 2022, Officer Troy Willard ("Willard") of the Garrard County Police Department ("GCPD") was contacted by a confidential informant ("CI") with information about a

---

[1] The Court ordered a copy of the suppression hearing transcript to be filed in the record. [DE 22]. However, at the time of filing this Report and Recommendation, the transcript had not yet been filed in the record. Accordingly, the factual background does not include references to the trial record.

possible drug transaction.  Willard first encountered the CI three or four days before November 24th when he performed a traffic stop on the CI and found a small quantity of methamphetamine on his person.  After that encounter and following charges against the CI, the CI told Willard that he could offer Willard information about drug traffickers in exchange for a reduced charge.  After their first encounter, Willard has only ever utilized the CI on the current incident with Helton.

Over a series of phone calls and text messages, the CI detailed for Willard a drug transaction between the CI and Helton.  Namely, Helton would be traveling from Lexington, Kentucky to Lancaster, Kentucky, on November 24th carrying large quantities of drugs in a safe and a backpack.  The CI stated that Helton would be meeting him that evening at the only McDonald's in Lancaster and would be driving a white truck.  Willard ran a background check on Helton and discovered Helton had a suspended license.

Willard, along with his drug dog and other members of the GCPD, set up across the street from the Lancaster McDonald's and waited for Helton's arrival.  The McDonald's was situated on the corner of U.S. 27 (a highway connecting Lancaster and Lexington) and Bethany Trace (a residential street that formed a loop with three homes).

The evening hours of November 24th turned into the early morning hours of November 25th, Thanksgiving morning.  Due to the time of day and holiday, the McDonald's was closed and there was no traffic in the area.  As he waited at the McDonald's, Willard maintained contact via text message with the CI, who was not on the scene, and received updates on Helton's location. At one point, the CI texted Willard a screenshot of his text-message conversation with Helton, which included an image of Helton's location on a map, travelling on U.S. 27 south towards Lancaster.

Finally, at approximately 4:14 a.m., Willard observed a white truck, travelling south on U.S. 27 from Lexington, turn onto Bethany Trace next to the McDonald's.  The truck began the short loop of Bethany Trace that would return it to the McDonald's.  In the interim, Willard texted the CI and received confirmation that the white truck was Helton.  Willard then drove up to the white truck, confronting it head-on.  Willard testified that he could see the driver of the truck directly through the front windshield, and he recognized the person as Helton based on Helton's driver's license picture.  Willard activated his lights pulling in front of the truck while another GCPD vehicle pulled in behind the white truck, also with its lights flashing.

Willard then immediately approached the truck, opened the driver's side door of the truck, pulled Helton out of the car, and placed him on the ground.  Willard testified that he could not recall whether he first asked Helton to produce any identification.  He further stated that it was not his intent to pursue a traffic ticket, but only to investigate the possible drug trafficking activities.  Officers also discovered an adult female passenger and a three-year-old child in the vehicle.

After pulling everyone out of the truck, Willard conducted a dog sniff on the outside of the vehicle using his dog that was trained and certified to detect several types of narcotics.  The dog alerted to the presence of narcotics on the rear driver's-side door.  Based on the dog's positive alert, Willard searched the truck and recovered a backpack and a safe containing suspected fentanyl, heroin, and methamphetamine.  Willard also recovered two loaded pistols and a rifle.

In addition to his current charges stemming from the traffic stop, Helton was cited for operating a vehicle on a suspended license in violation of Kentucky Revised Statutes (KRS) 186.620(2).

## II.    <u>ANALYSIS</u>

Helton argues officers lacked a sufficient basis to initiate a traffic stop and detain him while a dog sniff was being performed.[2]  Additionally, Helton asserts officers lacked probable cause to search his vehicle.  The United States offers two reasons to justify the stop of Helton's vehicle and his subsequent detention: (1) officers had a reasonable, articulable suspicion that Helton was engaged in drug activity; and (2) officers had probable cause to believe Helton was committing a civil traffic violation, namely, operating a vehicle on a suspended license.  [DE 21, Page ID# 76].  The United States also argues that the drug dog's alert to the presence of narcotics gave officers probable cause to search Helton's vehicle.  [*Id*. at 80].

In the end, the Court agrees with the United States' primary argument based upon reasonable suspicion.  On that ground, Helton's motion must be denied.  However, if the Court deems it necessary to reach the United States' secondary argument, the Court would disagree.  The analysis for both conclusions follows below.

## A.    <u>LEGAL FRAMEWORK</u>

The Fourth Amendment provides that "no Warrants shall issue, but probable cause, supported by Oath or affirmation, and particularly, describing the place to be searched, and the persons or things to be seized."  U.S. Const. Amend. IV.  "Temporary detention of individuals during the stop of an automobile by the police, even if only for a brief period and for a limited purpose, constitutes a 'seizure' of 'persons'" under the Fourth Amendment.  *Whren v. United States*, 517 U.S. 806, 809-10 (1986).  To constitutionally effect a traffic stop, "an officer must possess either probable cause of a civil infraction or reasonable suspicion of criminal activity."

---

[2] Although Helton did not expressly argue in his motion [DE 19] that officers lacked a reasonable suspicion that Helton was engaged in drug activity sufficient to conduct a traffic stop and detain him, Helton later made this specific argument at the suppression hearing.

*United States v. Lyons*, 687 F.3d 754, 763 (6th Cir. 2012) (citing *Gaddis ex rel. Gaddis v. Redford Twp.,* 364 F.3d 763, 771 n.6 (6th Cir. 2004)); *see also United States v. Blair*, 524 F.3d 740, 748 (6th Cir. 2008) (The Sixth Circuit "has developed two separate tests to determine the constitutional validity of vehicle stops: an officer must have probable cause to make a stop for a civil infraction, and reasonable suspicion of an ongoing crime to make a stop for a criminal violation." (citation omitted)). The exclusionary rule "requires the suppression of any evidence seized during a vehicle search premised on an illegal traffic stop." *Lyons*, 687 F.3d at 763 (citing *Blair*, 524 F.3d at 748).

As the proponent of the motion to suppress, Helton bears the burden of establishing that his Fourth Amendment rights were violated. *United States v. Coleman*, 923 F.3d 450, 455 (6th Cir. 2019) (citing *United States v. Witherspoon*, 467 F. App'x 486, 490 (6th Cir. 2012)). Generally, a defendant's showing that a warrantless search or seizure has occurred constitutes a *prima facie* showing of illegality. *United States v. Jackson*, No. 1:14-cr-29, 2015 WL 4509452, at *8 (E.D. Tenn. July 24, 2015) (citing *United States v. Herndon*, 501 F.3d 683, 692 (6th Cir. 2007)). The burden then rests on the United States to show by a preponderance of the evidence that the search and seizure was reasonable. *Jackson*, 2015 WL 4509452, at *8 (citing *United States v. Matlock*, 415 U.S. 164, n.14 (1974)).

There is no dispute that Helton was subjected to a warrantless search and seizure. However, the United States has shown by a preponderance of the evidence that Helton's seizure and the subsequent search of his vehicle was constitutional.

**B.    REASONABLE SUSPICION OF DRUG ACTIVITY**

The United States principally argues the traffic stop and Helton's subsequent detention was supported by Willard's reasonable suspicion that Helton was engaged in narcotics activity. The Court agrees.

"To satisfy the reasonable-suspicion standard, an officer must put forth 'more than an inchoate and unparticularized suspicion or hunch.'" *Whitley*, 34 F.4th at 532 (quoting *United States v. Sokolow*, 490 U.S. 1, 7 (1989)). This standard requires "considerably less than proof of wrongdoing by a preponderance of the evidence." *Sokolow*, 490 U.S. at 7. "In determining reasonable suspicion, '[f]irst, a court must identify all of the relevant historical facts known to the officer at the time of the stop and search; and second, it must decide whether, under a standard of objective reasonableness, those facts would give rise to a reasonable suspicion justifying a stop or probable cause to search.'" *Joshua v. DeWitt*, 341 F.3d 430, 443 (6th Cir. 2003) (quoting *Ornelas v. United States*, 517 U.S. 690, 700-01 (1996)). That is, whether an officer has a reasonable suspicion "is judged by the totality of the circumstances to 'determine whether the individual factors, taken as a whole, give rise to reasonable suspicion, even if each individual factor is entirely consistent with innocent behavior when examined separately.'" *United States v. Campbell*, 549 F.3d 364, 371 (6th Cir. 2008) (quoting *United States v. Perez*, 440 F.3d 363, 371 (6th Cir. 2006)). "This process allows officers to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that might well elude an untrained person." *United States v. Pearce,* 531 F.3d 374, 380 (6th Cir. 2008) (quoting *United States v. Arvizu*, 534 U.S. 266, 273 (2002)). Information relevant to that inquiry includes "the officer's own direct observations, dispatch information, directions from other officers, and the nature of the area and time of day during which the suspicious activity occurred." *Campbell*, 549 F.3d at 371 (citing *Pearce*, 531 F.3d at 383; *Dorsey v. Barber,* 517 F.3d 389, 395 (6th Cir. 2008)).

In examining Helton's motion, the Sixth Circuit's decision in *United States v. Pacheco*, 841 F.3d 384 (6th Cir. 2016), is instructive. There, an officer received a tip from a confidential source, who met the officer in-person, that two Hispanic men in a silver Lincoln Aviator would be

moving narcotics from a specific apartment complex in a specific area. *Id*. at 387. The source stated the men would be moving the narcotics in the evening, but he was unsure of the precise time. *Id*. The officers had never met the confidential source before this tip, and did not know his accuracy, reliability, or credibility. *Id.*

After receiving the tip, officers set up surveillance in an unmarked car. *Id*. Within forty-five minutes, the officer observed a silver Lincoln Aviator, driven by two Hispanic males, exit the apartment complex the confidential source identified. *Id*. The officer relayed this information to two other officers who were nearby, and one of the officers stated that the area was a "hotbed for gang activity." *Id*. After observing the vehicle commit several traffic infractions, officers conducted a traffic stop. *Id*. The officers testified that the driver appeared extremely nervous, was glancing around the vehicle, and initially did not respond to requests for identification. *Id*. After the passenger began rummaging around through the glove compartment, the officers had the passenger exit the vehicle, and they performed a pat down of his person. *Id*. The pat down yielded a brick of cocaine and a large chunk of money on the passenger's person. *Id*.

The Court determined that, although not dispositive of reasonable suspicion, the confidential informant's tip added support to the officer's basis for conducting a pat down of the passenger. *Id*. at 393. Specifically, the Court noted that the tip was sufficiently detailed and corroborated by officers to be properly considered as a factor in the reasonable suspicion analysis. The Court noted that "the confidential source gave authorities not only the make, model, and color of the vehicle—which turned out to be accurate. . . .—but also provided them with the number of occupants to expect, along with their ethnicity." *Id*. at 392. Further, the source provided officers with "the location and time of day to expect the vehicle." *Id.*

7

Turning back to Helton, the CI's tip in this case was both detailed and corroborated by Willard. Before stopping Helton, Willard was able to corroborate the CI's predictions as to: (1) the color and type of vehicle Helton would be driving, (2) the road Helton would be traveling and the direction from which Helton would be coming, and (3) the fact that Helton would stop at the only McDonald's in Lancaster. The CI provided location information received from Helton to Willard showing Helton's imminent, albeit revised, arrival time. The screenshot of texts between the CI and Helton also referenced the terms of the controlled narcotics transaction. Moreover, the CI was known to Willard, although their relationship was short-lived. *See United States v. Pacheco*, 841 F.3d 384, 393 n.3 (6th Cir. 2016) ("And here, rather than being an anonymous tip, the information was obtained from an informant whom Lipp knew and whom Best met in person, further supporting its reliability."); *see also Florida v. J.L.*, 529 U.S. 266, 270 (2000) (stating that an anonymous tip is less reliable than "a tip from a known informant whose reputation can be assessed and who can be held responsible if her allegations turn out to be fabricated.") Consequently, Officer Willard properly relied on the CI's tip, at least in part, as a basis for concluding there was reasonable suspicion that Helton was involved in drug activity.

Officer Willard was also correct to rely upon other suspicious circumstances surrounding Helton's activities. Helton, who lived in Lexington, was travelling to Lancaster, nearly an hour away, to a closed McDonald's at 4:14 a.m. on Thanksgiving morning. *See United States v. Betts*, 806 F. App'x 426, 430 (6th Cir. 2020) (noting that defendant's presence in an area at roughly 1:00 a.m. when all the adjacent businesses were closed was an indicator that, along with others, established reasonable suspicion of defendant's criminal activity); *see also United States v. Brignoni-Ponce*, 422 U.S. 873, 884 (1975) (noting that, in deciding whether reasonable suspicion exist, "[o]fficers may consider the characteristics of the area in which they encounter a vehicle[]");

8

*United States v. Coker*, 648 F. App'x 541, 545-46 (6th Cir. 2022) ("Conduct relatively benign in the light of day may pique one's suspicions in the dark of a late night, particularly where there is no other explanation for the late-night driving[.]"). There was no other traffic visible at that early hour on the holiday morning. Also, Willard confirmed that Helton was driving the car while on a suspended license, a suspicious and risky choice.[3] While "[e]ach of these facts, to be sure, may well be "consistent with innocent travel[,]" . . . "we do not employ a "divide-and-conquer analysis" for each thing an officer witnesses." *Coker*, 648 F. App'x at 541 (quoting *United States v. Sokolow,* 490 U.S. 1, 59 (1989)). Instead, the court "treat[s] the whole as greater than (or at least equal to) the sum of its parts." *Id*. Though not dispositive of the issue, these facts add support to Willard's reasonable suspicion that Helton was engaged in narcotics activity, especially viewed alongside the CI's corroborated information. *See Pacheco*, 841 F.3d at 393-94 (noting that confidential source's corroborated information was not dispositive, but, considered together with the defendant's nervousness, the time of day, and nature of the area in which the traffic stop occurred, the totality of the circumstances supported a finding of reasonable suspicion).

The information provided by the CI coupled with the suspicious circumstances of Helton's activities, when reviewing these facts in the totally of circumstances, was sufficient to create a reasonable suspicion of criminal activity. As such, Willard was justified in making the initial

---

[3] At the suppression hearing, Defendant made a well-presented argument that Willard could have not possibly seen Helton's face through the windshield prior to conducting the traffic stop, given that it was dark outside, the height of Helton's truck, and the fact that Helton was wearing a toboggin. However, what Helton was wearing and the height of Helton's truck are not facts that appear in the record, and Helton put on no evidence to counter Willard's testimony that he observed Helton as the one driving the vehicle before conducting the traffic stop. Accordingly, the Court finds credible Willard's testimony of this fact. *See United States v. Caldwell*, No. 1:13-CR-128, 2015 WL 179583, at *9 (E.D. Tenn. Jan. 14, 2015) ("In assessing credibility, a court considers numerous factors, ultimately relying on the common sense tests of reason and logic.").

traffic stop and detaining Helton while he conducted a dog sniff of the truck in order to confirm or dispel his suspicions.

## C.  PROBABLE CAUSE FOR A TRAFFIC STOP

The conclusion that Willard had reasonable suspicion of drug activity to detain Helton is dispositive of Helton's motion regardless of whether an alternative basis for the initial traffic stop exists.  Regardless, the United States argued in its Response that the traffic stop was independently supported by probable cause to believe Helton was operating a vehicle on a suspended license in violation of Kentucky Revised Statutes (KRS) 186.620(2),  [DE 21, Page ID# 76-77], and that such probable cause supported Hilton's detention.

The problem is that Willard's testimony wholly negated this argument.  When questioned, Willard made it clear that he neither stopped Helton for the possible traffic violation nor pursued the traffic violation prior to conducting a dog sniff.  Instead, Willard only pursued the narcotics investigation.  Thus, even assuming Willard had a probable cause basis to stop Helton based upon the traffic violation,[4] he unquestionably abandoned such an effort in favor of the narcotics investigation.  *See United States v. Whitley*, 34 F.4th 522, 529 (6th Cir. 2022) (quoting *United States v. Rodriguez*, 575 U.S. 348, 355-56 (2015)); *see also United States v. Lott,* 954 F.3d 919,

---

[4] Generally, "the permissibility of a traffic stop turns not on subjective intent, but rather on objective fact."  *United States v. Hughes*, 606 F.3d 311, 315 (6th Cir. 2010); *see also Whren v. United States*, 517 U.S. 806, 813 (1996) ("We think these cases foreclose any argument that the constitutional reasonableness of traffic stops depends on the actual motivations of the individual officers involved. . . . Subjective intentions play no role in ordinary, probable-cause Fourth Amendment analysis.").  But at least one court in this circuit has found that an otherwise valid basis for upholding a traffic stop could not be considered where the officer conceded that it was not the basis of the stop.  *See United States v. Jackson*, 544 F.Supp.3d 817 (M.D. Tenn. June 15, 2021) ("And even if the vehicle did have a tint violation, that violation would not provide an independent basis for upholding the stop in this case because '[t]he court cannot determine that an officer had reasonable suspicion [or probable cause] on the basis of a factor on which the officer did not actually rely.'" (quoting *United States v. Townsend*, 305 F.3d 537, 41 (6th Cir. 2010)).  Nevertheless, the Court need not weigh in on this issue because Willard's reasonable suspicion is dispositive of Helton's motion.

924 (6th Cir. 2020) (citing *Rodriguez*, 575 U.S. at 355-57) (stating that, while "[a] dog sniff, safety measures taken to facilitate a different investigation, and unrelated questioning, for example, are not tasks incident to the initial stop[,]" a traffic stop can be extended to accommodate such unrelated tasks as long as the officer has independent reasonable suspicion).  Indeed, the United States all but conceded the problematic nature of Willard's testimony when it, like Willard, abandoned the argument of detention of Helton based upon the possible traffic citation.  Rather, the United States deflected any question on the issue by highlighting that Willard's reasonable suspicion of drug activity justified both the stop and detention of Helton.  Only out of thoroughness and because the United States never fully conceded the point, the Court rejects this secondary argument supporting Hilton's detention, albeit unnecessary given the finding concerning reasonable suspicion detailed above.

**D.    THE SEARCH OF HELTON'S VEHICLE**

Finally, Helton briefly asserted in his motion that officers lacked probable cause to search his vehicle.[5]  This argument plainly lacks merit.

It is well-settled that an "alert by a properly trained and reliable drug-detection dog 'is sufficient to establish probable cause for the presence of a controlled substance.'"  *United States v. Stubblefield*, 682 F.3d 502, 507 (6th Cir. 2012) (quoting *United States v. Diaz,* 25 F.3d 392, 394 (6th Cir. 1994)).  Willard's testimony at the suppression hearing established that his dog had satisfactorily performed in a drug-dog training program and could detect several controlled substances, including heroin, methamphetamine, and cocaine.  Helton made no argument that the drug dog was not sufficiently reliable to alert to the presence of narcotics.  Further, it is undisputed that Willard's drug dog positively alerted to the presence of narcotics in Helton's vehicle.

---

[5] Helton did not pursue this argument at the suppression hearing.

Accordingly, Willard's drug dog's alert to the presence of narcotics on Helton's vehicle provided probable cause to search the vehicle.  Suppression is not appropriate on this basis.

### III.    CONCLUSION

For the reasons stated herein, the Court **RECOMMENDS** that the District Court **DENY** Helton's Motion to Suppress [DE 19].  The Court directs the parties to 28 U.S.C. § 636(b)(1) for appeal rights concerning this recommendation, issued under subsection (B) of that statute.  As defined by § 636(b)(1), Fed. R. Crim. P. 59(b)(2), and agreement of the parties, within **seven days** after being served with a copy of this recommended decision, any party may serve and file written objections to any or all portions for consideration, de novo, by the District Court.

Entered this the 12th day of September, 2022.

MATTHEW A. STINNETT
UNITED STATES MAGISTRATE JUDGE
EASTERN DISTRICT OF KENTUCKY